UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>                                        Plaintiffs,<br><br>-against-<br><br>MAZAL PHARMACY, INC D/B/A MIRAGE PHARMACY, SOLOMON MOSES A/K/A SULEMAN MUSAEV, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                                        Defendants. | CIVIL ACTION<br><br>24-CV-6570<br><br>COMPLAINT<br><br>(JURY TRIAL DEMANDED) |

Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (interchangeably referred to herein as "Plaintiffs" and "Allstate"), by their attorneys Manning & Kass, Ellrod, Ramirez, Trester LLP, for their Complaint against Defendants Mazal Pharmacy Inc d/b/a Mirage Pharmacy ("Mazal"), Solomon Moses a/k/a Suleman Musaev ("Moses") (Mazal and Moses are collectively referred to as "Pharmacy Defendants"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively, "Defendants") allege as follows:

## PRELIMINARY STATEMENT

1.      From at least 2021 and continuing through the filing of this Complaint, Defendants engaged in a massive scheme to defraud Plaintiffs, through the exploitation of New York's Comprehensive Motor Vehicle Insurance Reparations Act (popularly known as the "No-fault Law").

2.      Pursuant to the No-fault Law, policyholders and others who suffer injuries in automobile accidents ("Covered Persons") can obtain payments from the policyholders' automobile insurance companies, including Plaintiffs, for necessary medical care ordered by the

Covered Persons' physicians or prescribing providers. Covered Persons are also permitted to assign those benefits to doctors and other licensed healthcare providers, including pharmacies, enabling them to bill insurance companies directly for their services.

3.     This action seeks to recover more than $134,000.00 that Defendants stole from Plaintiffs, and other economic injuries suffered by Allstate which flowed directly from the submission of hundreds of false and/or fraudulent insurance claims, seeking reimbursement for specifically-targeted, medically unnecessary "pain relieving" pharmaceutical products, including topical pain creams and a limited variety of other oral medications.

4.     As part of the scheme to defraud alleged herein, the Pharmacy Defendants entered into illegal kickback arrangements with No-fault clinics in the New York metropolitan area (the "Prescribing No-fault Clinics" or "No-fault Clinics") and unlicensed laypersons who work at or are associated with the No-fault Clinics ("Clinic Controllers") pursuant to which the No-fault Clinics prescribed expensive, pre-formulated topical pain creams, gels, lotions and ointments dispensed and billed in exorbitant prices by Mazal, including, Diclofenac Sodium 3% gel and Lidocaine 5% ointment (the "Topical Pain Creams"), as well as a select few oral medications, primarily in the form of a limited variety of nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as Ibuprofen, Naproxen, and Celecoxib, migraine medication and a limited variety of muscle relaxers, such as Baclofen, Cyclobenzaprine, and Tizanidine.  Pursuant to the illegal kickback arrangements, these medications were routinely prescribed to Covered Persons, rather than commercially available and more affordable over-the-counter medications and pain creams that have been approved by the FDA. Mazal targeted the Topical Pain Creams and other select oral medications rather than the cheaper over-the-counter alternatives for no other purpose than to

submit fraudulent, inflated bills to Plaintiffs for reimbursement, exploiting the Covered Persons for financial gain, without regard to genuine patient care.

5.     In furtherance of Defendants' scheme to defraud, Covered Persons who were purportedly involved in automobile accidents would present to the Prescribing No-fault Clinics where they would, as a matter of pattern, practice and protocol, be prescribed certain medications specifically targeted for their high profit margins, including Topical Pain Creams and/or a limited variety of other medications such as NSAIDs, migraine medication and/or muscle relaxers, irrespective of medical necessity.

6.     The prescriptions, which were issued by Prescribing No-fault Clinics and sent to Mazal for dispensing and billing, were tailored to boilerplate, pre-printed examination reports designed to limit the prescribing providers' prescriptions to a predetermined treatment protocol, and justify continued, voluminous and excessive use of prescribed pharmaceuticals, including the Topical Pain Creams and other select oral medications.

7.     To effectuate the scheme and maximize profits, the Pharmacy Defendants dispensed a handful of specific pain medications, including the Topical Pain Creams and a select few oral NSAIDs and muscle relaxers, based solely on the medications' exorbitant pricing and high profit margins.  In exchange for kickbacks and financial incentives and pursuant to collusive, illegal arrangements, Defendants induced the Prescribing No-fault Clinics, Clinic Controllers and prescribing providers to prescribe these targeted, exorbitantly priced pain medications, including the Topical Pain Creams and other select NSAIDs, migraine medication and/or muscle relaxers, without regard to genuine patient care, and directed large volumes of these prescriptions to Mazal.

8.     Once the Topical Pain Creams and/or other oral medications were prescribed, if they were dispensed at all, the pharmaceuticals were either given to Covered Persons directly at

the Prescribing No-fault Clinics or mailed to the Covered Persons from Mazal.  Covered Persons were not given any choice as to where their prescriptions would be filled.

9.      When the Pharmacy Defendants purported to provide the Topical Pain Creams and/or other medications to Covered Persons covered by Plaintiffs, Mazal sought reimbursement directly from Plaintiffs pursuant to executed "Assignment of Benefit" ("AOB") forms and New York State Department of Insurance claim form ("NF-3"), often with additional forms listing each billed-for pharmaceutical by its national drug code ("NDC")[1] number.

10.     The Pharmacy Defendants also never submitted wholesale purchase invoices to Plaintiffs demonstrating the NDC number for the pharmaceuticals Mazal obtained and how much Mazal actually paid the suppliers for these pharmaceuticals or whether Mazal actually purchased the pharmaceuticals with the NDC numbers listed in the billing submissions.

11.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Moses through Mazal sought reimbursement for Topical Pain Creams or other select NSAIDs and muscles relaxers that the Pharmacy Defendants could readily buy at a low cost and bill to Plaintiffs at inflated amounts based on egregiously high wholesale prices.  Defendants steered the Prescribing No-fault Clinics and prescribing providers to prescribe these pharmaceuticals specifically because of their high profit margins, irrespective of medical necessity, pharmacological outcome or genuine patient care and despite the availability of cheaper over-the-counter and FDA-approved medications.

12.     On information and belief, by entering into kickback arrangements with the Prescribing No-fault Clinics for Topical Pain Creams and/or a select number of oral medications,

---

[1] A National Drug Code ("NDC") number is a unique 10-digit code that identifies each prescription drug product (whether brand name or generic) by the drug itself, the vendor of the drug and the quantity in which the drug was packaged.

and by dispensing these Topical Pain Creams and other medications irrespective of medical necessity pursuant to bogus prescriptions, Defendants engaged in conduct which demonstrated a blatant disregard for the laws of New York State which govern the proper operation of a pharmacy and the proper dispensing of drug products, as well as laws which prohibit illegal fee splitting and the solicitation of patients.

13.     By way of example and not limitation, New York Education Law § 6509-a, prohibits a professional licensee, such as a pharmacy, from directly or indirectly requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications, and 8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee, such as a pharmacy from directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

14.     In addition, the Official Compilation of Codes, Rules and Regulations of the State of New York governing Official Prescriptions, Section 910.2(f), states that an order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law and the person knowingly dispensing such an order, as well as the person issuing such order, shall be subject to all penalties provided in law or regulations.

15.     The scheme to defraud orchestrated by the Pharmacy Defendants by which they routinely dispensed the Topical Pain Creams and/or a limited variety of other medications, including NSAIDs and muscle relaxers, without regard to medical necessity, not only

demonstrated a deliberate disregard for the laws of New York State in furtherance of theft from Plaintiffs, but also posed a significant risk to the health of patients.

16.     Moses, through Mazal, fraudulently submitted, or caused to be submitted, bills to Plaintiffs for Topical Pain Creams and a select variety of oral medications, including NSAIDs and muscle relaxers, that were provided to Covered Persons (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.   By way of example and not limitation, Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheet listing representative samples of claims Plaintiffs paid to Mazal for Topical Pain Creams and the select variety of oral medications that were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) as the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

17.     In each instance, the Pharmacy Defendants knew or should have known that the claims they submitted to Plaintiffs were bogus and contained material and misleading statements regarding the propriety of the billed-for services. In particular, the Pharmacy Defendants knew or should have known that the claims that they submitted to Plaintiffs were for Topical Pain Products and a select variety of oral pain medications which were provided: (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws

regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions.

18.      On information and belief, the Defendants willfully engaged in the practices alleged herein with the sole object of converting money.

19.      In addition to payments resulting from fraudulent claims, the fraudulent activities engaged in by Defendants caused Plaintiffs to suffer further economic injury, including, but not limited to, expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

20.      It was a foreseeable consequence of Defendants' scheme to defraud that Plaintiffs would incur expenditures in an effort to verify Defendants' fraudulent claims.

21.      At all times relevant herein, but-for the Pharmacy Defendants' fraudulent misrepresentations, Plaintiffs would not have incurred expenditures in an effort to verify Defendants' fraudulent claims.

22.      At all times relevant herein, Defendants fraudulent misrepresentations directly and proximately resulted in Plaintiffs incurring expenditures in an effort to verify the Pharmacy Defendants' fraudulent claims.

23.      The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies. The Defendants adopted a fraudulent blueprint regarding the dispensing of pharmaceuticals, including but not limited to Topical Pain Creams and a select variety of oral medications, including NSAIDs, migraine medications, and muscle relaxers, as their business plan, and used it to participate in a systematic pattern of racketeering activity. Every facet

of Defendants' operations, from the creation of fraudulent NF-3s, to the formation of kickback arrangements with the Prescribing No-fault Clinics, to the illegal bulk dispensing of Topical Pain Creams, to record keeping to billing, was carried out for the purpose of committing fraud.

24.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for pharmaceutical products.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of Mazal's claims for Topical Pain Creams or the other select variety of oral medications, including NSAIDs and muscle relaxers, submitted to Plaintiffs for reimbursement because they were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions. By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of unpaid No-fault claims from Mazal of approximately $162,000.00, which form the basis of Plaintiffs' request for declaratory relief.  Said spreadsheet is grouped by claim number, date of service and the amount pending.

## STATUTORY/REGULATORY SCHEME

25.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other

properly licensed healthcare providers, including pharmacies, enabling them to bill insurance companies directly for their services.

26.     As alleged herein, the Pharmacy Defendants exploited and continue to exploit the No-fault Law by obtaining such assignments, and dispensing and billing for Topical Pain Creams and other select oral medications, including NSAIDs and muscle relaxers, that if provided at all, were medically unnecessary and provided pursuant to a fraudulent protocol in which in which virtually all Covered Persons were prescribed the Topical Pain Creams and/or the select variety of oral medications irrespective of need and in violation of state and/or federal law.

27.     Mazal is ostensibly a licensed pharmacy that bills for pharmaceuticals provided to, among others, individuals covered under the No-fault Law. In exchange for their services, Mazal accepted assignments of benefits signed by Covered Persons and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

28.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Mazal submitted bills for their claims to Plaintiffs using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or NF-3 form, or a substantially similar form.

29.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Mazal contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or a statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, … commits a fraudulent insurance act, which is a crime….

30.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

31.     Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a pharmacy, may recover for health service-related expenses. In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

32.     Pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault law.  11 N.Y.C.R.R. § 68.1.

33.     Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") which is a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

34.     Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

35.     The maximum amount that a healthcare provider may charge for a medically necessary prescription drug or product pursuant to the No fault Law is based upon the drug's NDC number.

36.     Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

37.     For each generic drug, the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

38.     AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

> "[t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee."

39.     On information and belief, Mazal was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

40.     On information and belief, Defendants intentionally targeted Topical Pain Creams with extremely expensive AWPs in order to inflate the billing submitted through Mazal and to maximize their profits.

41.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, to the extent that they provided any Topical Pain Creams at all.

## NATURE OF THE ACTION

42.     This action is brought pursuant to:

i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. § 1962(c);

ii)     New York State Common Law; and

iii)    The Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

## NATURE OF RELIEF SOUGHT

43.     Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for pharmaceutical products, including but not limited to Topical Pain Creams that it allegedly dispensed to individuals covered by Plaintiffs under New York State's No-fault Law.

44.     Plaintiffs seek compensatory and punitive damages under the Common Law.

45.     Plaintiffs further seek recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

46.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Defendants' unpaid No-fault claims for Topical Pain Creams and select other oral medications, including NSAIDs and muscle relaxers, which were dispensed pursuant to the fraudulent scheme set forth herein.

47.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded an amount in excess of $134,000.00, the exact amount to be determined at trial, in the form of payments to Defendants and/or expenses incurred by Plaintiffs as a result of Defendants

fraudulently billing Plaintiffs for Topical Pain Creams and select other oral medications, primarily in the form of oral pain relievers and muscle relaxants, that they knew or should have known were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions.

### THE PARTIES

**A.**      **Plaintiffs**

48.      Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

49.      Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

50.      Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

51.      Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

52.      Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

**B.**     **Pharmacy Defendants**

53.     Mazal Pharmacy Inc d/b/a Mirage Pharmacy ("Mazal") was incorporated on or about June 16, 2021 and filed a Certificate of Assumed Name on August 9, 2021.  Mazal was first registered as a pharmacy with the New York State Office of Professions on October 14, 2021 and purports to operate its principal place of business from 71-44 Main Street, Flushing, New York 11367.  Mazal is operated, managed, and/or controlled by Moses and submitted fraudulent claims to Plaintiffs seeking reimbursement for pharmaceutical products under the No-fault Law.

54.     Solomon Moses a/k/a Suleman Musaev ("Moses") is a natural person residing in the State of New York, and is the principal record owner, officer and/or operator of Defendant Mazal, and at all times relevant herein, operated, managed, and/or controlled its activities.

**C.**     **The John Doe Defendants**

55.     On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**D.**     **The ABC Corporations**

56.     On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

57.     The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; 28 U.S.C. §§ 1331; and principles of pendent jurisdiction.

58.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

59.     The Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a), and the claim for declaratory relief based upon 28 U.S.C. § 2201 and § 2202.

60.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York C.P.L.R. § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

61.     Venue lies in this District Court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND

62.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

63.     Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law §§ 5101, *et seq.*, Plaintiffs are required to pay, *inter alia*, for health service expenses that are incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

64.     The Pharmacy Defendants purportedly dispensed pharmaceutical products to Covered Persons for the purported treatment of soft tissue injuries, such as sprains, and musculoskeletal pain and submitted claims for payment to Plaintiffs for such services.

65.     In purported compliance with the No-fault Law and 11 N.Y.C.R.R. 65 et seq., the Pharmacy Defendants submitted proof of their claims to Plaintiffs using a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or NF-3 form or a substantially similar form.

66.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by the Defendants contained the following (or substantially similar) warning on the back of the claim form:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, may be guilty of a criminal act punishable under law and may be subject to civil penalties.

67.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process claims within 30 days of receipt of the proof of claim.

68.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Moses through Mazal in support of their claims for pharmaceutical products, and paid Mazal based on the representations and information that Defendants submitted to Plaintiffs.

69.     At all relevant times Mazal was an illegal enterprise that engaged in common, systematic and pervasive fraudulent practices.

70.     Mazal, which is purportedly owned, operated and controlled by Moses was part of a racketeering scheme that distinguished it from a legitimate healthcare provider/pharmacy as follows:

- Unlike legitimate pharmacies, Mazal routinely misrepresented that it was dispensing Topical Pain Creams pursuant to legitimate New York State Prescriptions, when it was not;

- Unlike legitimate pharmacies, Mazal, arranged to have prescriptions submitted to them directly by the prescribing practitioners without allowing the patients to select their pharmacies;

- Unlike legitimate medical providers, Mazal misrepresented that it was in conformance with material licensing requirements which would entitle it to reimbursement of No-fault benefits when, in fact, it was involved in collusive relationships with providers that issue illegal prescriptions pursuant to an unlawful kickback arrangement and/or other financial incentives; and

- Unlike legitimate medical providers, Mazal entered into kickback agreements with No-fault Clinics in order to generate a large volume of prescriptions pursuant to a fraudulent, pre-determined treatment and billing protocol whereby Covered Persons received Topical Pain Creams and/or other oral medications irrespective of medical necessity.

71.     The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Moses engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) issue prescriptions for large amounts of virtually identical Topical Pain Creams and other select oral medications to their patient population, and/or (ii) fabricate and/or fraudulently alter prescriptions, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Mazal, numerous fraudulent claim forms seeking payment for Topical Pain Creams and other select oral medications that were purportedly (but not actually) provided to many Covered Persons;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

72.     At all relevant times mentioned herein, Moses knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Topical Pain Creams and other select oral medications.

73.     At all relevant times mentioned herein, Moses, through Mazal, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

74.     At all relevant times mentioned herein, Moses and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

75.     In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

A.     **The Fraudulent Prescriptions and Examination Reports**

76.     As a matter of pattern, practice and protocol, the Prescribing No-fault Clinics routinely prescribed, or purported to prescribe, the Topical Pain Creams and select other medications, including NSAIDs, migraine medication and muscle relaxers, utilizing, boilerplate forms.

77.     On information and belief, in furtherance of this predetermined protocol and in order to further facilitate the fraud set forth herein, Defendants entered into agreements with one

or more of the Prescribing No-fault Clinics, Clinic Controllers and prescribing providers to utilize generic, boilerplate examination reports specifically designed to justify the continued and voluminous use of medically unnecessary Topical Pain Creams and other select oral medications, including NSAIDS, migraine medications and muscle relaxers.

78.     The Prescribing No-fault Clinics and Clinic Controllers would, in many instances, utilize generic, boilerplate examination reports with preprinted medications designed to intentionally limit the pharmaceutical options available to Covered Persons to those which could reap Defendants the most profits, notwithstanding any perceived benefit or harm to Covered Persons.

79.     Moreover, the reliance upon generic, preprinted, boilerplate examination reports by No-fault Clinics, Clinic Controllers and/or prescribing providers renders the prescriptions submitted by Defendants to Plaintiffs in violation of Section 910 of the Official Compilation of Codes, Rules and Regulations of the State of New York, which provides that:

> "[a] prescription shall be issued by a practitioner for legitimate medical purposes in good faith and in the course of his or her professional practice only. An order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law and the person knowingly dispensing such an order, as well as the person issuing such order, shall be subject to all penalties provided in law or regulations."

*See* 10 N.Y.C.R.R. § 910(2)(f).

80.     On information and belief, at all times relevant herein, the Defendants knew or should have known that the pre-printed, boilerplate evaluation forms were bogus.

B.     **Overview of Laws and Regulations**

*Overview of Guidelines for Topical Pain Creams*

81.     On information and belief, topical pain creams, such as Diclofenac Sodium gel 3% and Lidocaine 5% ointment, are a type of topical pain-relief drug that are "locally administered treatments".

82.     The role of topical pain creams in pain management is not a scientifically proven fact. By way of example and not limitation, according to medical literature, due to the absence of specific compliance and adherence studies comparing topical treatment versus traditional routes in pain management, the role of topical preparations in patient adherence remains obscure.

83.     Topical pain creams should undergo trials, including in the case of topical lidocaine, a trial in the range of 2-4 weeks.

84.     The ingredients used in the Topical Pain Creams include NSAIDs, which is not always appropriate in some clinical settings. For example, it is well known that people who use NSAIDs (other than aspirin) may have a higher risk of having a heart attack or a stroke than people who do not use those medications, and these events may happen without warning and may even cause death.

85.     The medical standard in reference to topical drug delivery, as presented in the Workers Compensation Board New York Non-Acute Pain Medical Treatment Guidelines, First Edition, September 15, 2014, pages: 37-38, and current edition, effective May 2, 2022, page 39, states the following: "For most patients, the effects of long-term use are unknown and thus may be better used episodically. These agents may be used in those patients who prefer topical treatments over oral medications."

86.     According to the latest Workers Compensation Board Medical Treatment Guidelines (First Edition, September 15, 2014, pages: 28-38; Current edition, effective May 2,

2022, page 32) regarding Non-Acute Pain, "Topical, oral, and/or systemic compound medications are not recommended."

### *Overview of New York State Laws and Regulations Regarding Operations of Legitimate Pharmacies*

87.     Pursuant to New York State law, a provider of healthcare services is not entitled to reimbursement for No-fault Benefits if the provider fails to meet any applicable New York state or local licensing requirement necessary to perform such service in New York. *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

88.     New York Education Law § 6808, prohibits a person, firm, corporation, or association from possessing drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or offering drugs, prescriptions, or poisons for sale at retail or wholesale unless they are registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

89.     New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of secret formula ("coded") or specially marked prescriptions.

90.     New York Education Law § 6810(7)(a) prohibits pharmacies from dispensing a drug when a prescription form for the drug includes any other drug.

91.     New York Education Law § 6810(9) prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

92.     New York Education Law § 6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of coded prescriptions.

93.     New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

94.     8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

95.     New York Education Law § 6530(18) prohibits a licensed physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in exchange for patient referrals or in connection with the performance of professional services.

96.     New York Education Law § 6530(17) prohibits pharmacies and other health care professionals from "[e]xercising undue influence" over a patient, including by the "promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

97.     8 N.Y.C.R.R. §29.1(b)(2) further provides that it constitutes professional misconduct when a pharmacies or other health care professionals "exercise[] undue influence" over a patient or client including by the "promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

98.     8 N.Y.C.R.R. § 63.6(b)(7) requires that pharmacists "conduct a prospective drug review before each prescription is dispensed or delivered to a patient or person authorized to act

on behalf of the patient. Such review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse."

99.     New York Education Law § 6808(2)(c), requires that the "names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

100.    New York Education Law § 6808(e) requires that every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

101.    New York Education Law § 6808(e) provides that pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

102.    New York Education Law § 6808(e) provides that pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

103.    New York Education Law § 6808(h) requires that individual applicants and all officers, directors, and shareholders with at least ten percent interest in corporate applicants "shall be over good moral character."

## MECHANICS OF THE SCHEME TO DEFRAUD

104.    Beginning in 2021 and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Topical Pain Creams and other select oral medications, such as NSAIDs and muscle relaxers to Covered Persons.

23

105.    Moses, through Mazal, devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, by making material misrepresentations in bill submissions to Plaintiffs and fraudulently billing for Topical Pain Creams and other select oral medications, including NSAIDs and muscle relaxers, which were provided, if at all, irrespective of medical necessity, pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, and further, cost the Pharmacy Defendants a fraction of the amounts that they materially misrepresented in their fraudulent bill submissions to Plaintiffs.

106.    Defendants engaged in a massive scheme to defraud in which Moses, through Mazal, as a matter of pattern, practice and protocol, manufactured, dispensed, or caused to be dispensed, expensive Topical Pain Creams, including Diclofenac 3% gel and Lidocaine 5% ointment, and other specifically targeted, select oral medications, including NSAIDs and muscle relaxers, to Covered Persons irrespective of medical necessity.

107.    In 2015, the Department of Health and Human Services, Office of the Inspector General, issued a report noting the potential for fraud in abuse by pharmacies in New York related to the prescription, among other topical pain medications, diclofenac sodium 3% gel, and lidocaine 5% pain patches. *See Questionable Billing and Geographic Hotspots Point to Potential Fraud and Abuse in Medicare Part D,* OEI-02-15-00190 (June 2015)

108.    Moreover, in 2018, the U.S. Department of Health and Human Services, Office of the Inspector General, issued a report noting that fraud and abuse by pharmacies was significant in the prescribing and dispensing of products containing diclofenac and/or lidocaine. *See, Questionable Billing for Compounded Topical Drugs in Medicare Part D*, OEI-02-16-00440 (August 2018).

24

109.     Here, by way of example and not limitation, the Topical Pain Creams and other select oral medications account for nearly 95% of the billing to Plaintiffs from Mazal.

110.     Mazal purports to be a storefront pharmacy operating in Astoria, New York, but does not advertise to the general public, have a website advertising its products or services, and does not otherwise market or seek business from individual patients.

111.     Instead, as part of their pattern, practice and protocol, and in furtherance of their massive scheme to defraud, Defendants entered into illegal, collusive agreements whereby the Pharmacy Defendants paid kickbacks to No-fault Clinics and Clinic Controllers in exchange for the No-fault Clinics' and prescribing providers' prescribing large volumes of the Topical Pain Creams, including Diclofenac 3% gel and Lidocaine 5% ointment, and other select oral medications, including NSAIDs and muscle relaxers, which were specifically targeted for their high profit margins, and directing these prescriptions to be dispensed and billed by Mazal.

112.     In fact, a vast majority of the billing that Mazal submitted to Plaintiffs for reimbursement of pharmaceuticals dispensed, if at all, to Covered Persons came from a few prescribing physicians or practices, with a history of engaging in fraudulent No-fault billing schemes.

113.     By way of example but not limitation, numerous fraudulent prescriptions submitted in claims for reimbursement from Mazal to Plaintiffs were issued by medical providers that purportedly provided services through Atlantic Medical & Diagnostic PC, a professional corporation in which Jonathan Landow ("Landow") is listed as the record owner and which operates out of several locations throughout the New York metropolitan area.   Landow and several of his professional corporations in which he is listed as the record owner, including Atlantic Medical & Diagnostic, P.C., have been sued by multiple No-fault insurance carriers for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services

pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See, e.g., Allstate Ins. Co., et al, v. Landow, M.D., et al.*, 24-cv-02010 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Landow, M.D., et al.*, 21-cv-01440 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Urban Medical, P.C., M.D., et al.*, 18-cv-02956 (E.D.N.Y.); *Travelers Pers. Ins. Co., et al. v. Landow, M.D., et al.*, Index No. 656567/2021 (N.Y. Sup. Ct., N.Y. County).

114.    By way of further example but not limitation, numerous other fraudulent prescriptions for Topical Pain Creams and other select oral medications, resulting in claims submitted by Fill RX to Plaintiffs, were issued by medical providers that purportedly provided medical services through Tri-Borough Medical Practice, P.C., a professional corporation in which Leonid Shapiro ("Shapiro") is listed as the record owner, which operates out of as many as 30 different locations throughout the New York metropolitan area.  Shapiro has been sued by multiple No-Fault insurance carriers for allegedly engaging in engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements.  *See Government Employees Ins. Co. et al. v. Moshe, et al.,* 20-cv-1098 (FB)(RER) (E.D.N.Y. 2020); *State Farm Mut. Auto. Ins. Co. et al. v. Metro Pain Specialists P.C., et al,* 21-cv-5523 (MKB)(PK) (E.D.N.Y. 2021); *Allstate Ins. Co. et al v. Metro Pain Specialists Professional Corporation et al,* 21-cv-5586 (DG)(RER) (E.D.N.Y. 2021).

115.    These Topical Pain Creams and other select oral medications, including NSAIDs and muscle relaxers, were prescribed and dispensed pursuant to a predetermined protocol that lacked individualized care, was designed to exploit patients for financial gain, was implemented without regard to pharmacologic outcomes and was implemented with gross indifference to a patient's health and safety.

116.    On information and belief, in connection with the unlawful financial arrangements with No-fault Clinics, the Pharmacy Defendants would pay kickbacks to individuals associated with the No-fault Clinics in order to obtain referrals for the fraudulent Topical Pain Cream and/or other select oral medications to be provided to Covered Persons who treated at the Clinics.

117.    On information and belief, in keeping with the fact that the prescriptions for Topical Pain Cream and/or other select oral medications were the result of unlawful kickbacks and/or referral relationships between the pharmacy and the Clinics, Moses never met most of the physicians who purportedly signed the prescriptions that were provided to the Pharmacy Defendants.  Moreover, a number of the prescriptions submitted by Moses, through Mazal, to Plaintiffs were fabricated in order to misrepresent that medications were medically necessary, when in fact, the medications were provided, if at all, to financially enrich Moses through a fraudulent protocol of treatment.

118.    Further, the prescriptions from the Clinics were sent to and obtained by Mazal directly from the Clinics without any communication or involvement by the Covered Persons.  In further keeping with the fact that the prescriptions for the Topical Pain Creams were the result of unlawful financial arrangements between the Pharmacy Defendants and the No-fault Clinics, the Covered Persons were never given access to the prescriptions or given the option to use any other pharmacy other than Mazal.

119.    At all relevant times mentioned herein, the Topical Pain Cream and/or other select oral medications supplied by Mazal was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, who provided the prescriptions to Mazal to be used in support of the fraudulent Topical Pain Cream

claims that exploited and manipulated the payment formulas under the applicable Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

120.    As a result of the unlawful kickback and/or other financial compensation agreements, the Pharmacy Defendants obtained large numbers of prescriptions and access to Covered Persons' identifying information that enabled them to bill hundreds of thousands of dollars to Plaintiffs, for just a few exorbitantly priced Topical Pain Cream and/or other select oral medications.

121.    But for the payment of kickbacks from the Pharmacy Defendants, the No-fault Clinics, would not have had any reason to: (i) direct a substantial number of medically unnecessary prescriptions to Mazal; (ii) make the Covered Persons' information available to Mazal; and/or (iii) provide Mazal with the fraudulent prescriptions.

122.    Upon information and belief, the payment of kickbacks and/or other financial compensation  by the Pharmacy Defendants was made at or near the time the prescriptions were issued, but the Pharmacy Defendants and the No-fault Clinics affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

123.    As a result of the unlawful financial arrangements, the Pharmacy Defendants billed hundreds of thousands of dollars to Plaintiffs, and likely millions of dollars to other New York automobile insurers, for the Topical Pain Cream and/or other select oral medications.

A.    **Fraudulent Dispensing and Billing of Topical Pain Creams Without Regard to Patient Care in Order to Exploit Patients for Financial Gain**

124.    As part of Defendants' scheme to defraud, Defendants entered into kickback or other financial arrangements with the Prescribing No-fault Clinics and/or prescribing providers, who instead of prescribing cheaper FDA-approved and/or commercially available medication to

28

Covered Persons, would instead prescribe and/or dispense the Topical Pain Creams, including Diclofenac 3% gel and Lidocaine 5% ointment, which were prescribed without regard to the efficacy and/or medical necessity of the drugs, and often combined these Topical Pain Creams with prescriptions for other select oral medications, including NSAIDs and muscle relaxers, which constituted therapeutic duplication, increasing the risk for adverse events in the Covered Persons without any additional therapeutic benefit.

125.   Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the Prescribing No-fault Clinics, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the Prescribing No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with Defendants, would prescribe Topical Pain Creams and/or other select oral medications, including NSAIDs and muscle relaxers, pursuant to a standard, predetermined protocol regardless of whether such pharmaceuticals were medically necessary.

126.   Such Topical Pain Creams and other select oral medications, including NSAIDs and muscle relaxers, were issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident and without first trying commercially available alternative medications that are FDA-approved and available at significantly less cost.

127.   In fact, pursuant to the standard, predetermined protocol, the Covered Persons were routinely prescribed the Topical Pain Creams and other select oral medications, including NSAIDs and muscle relaxers, without the prescribing provider first taking a detailed patient history and without determining whether the Covered Person was currently taking any medications or suffering from any comorbidities.

128. Pursuant to the standard, predetermined protocol, the Covered Persons were routinely prescribed the Topical Pain Creams and/or other select oral medications, including NSAIDs, migraine medications, and muscle relaxers, pursuant to regimented initial and follow-up examinations, which, on information and belief, were designed to justify continued, voluminous and excessive use of prescribed pharmaceuticals. The resulting examination evaluation reports rarely gave any indication as to why alternative FDA-approved and/or over-the-counter medications would not sufficiently address the Covered Person's condition.

129. Irrespective of the needs of any individual Covered Person, the Prescribing No-fault Clinics prescribed the same pre-made, formulaic Topical Pain Creams, which contained the exact same amount of simple ingredients, including Diclofenac 3% gel and Lidocaine 5% ointment, and/or other pharmaceuticals to each and every Covered Person.

130. On information and belief, as part of the kickback or other financial compensation agreement with the Prescribing No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the Prescribing No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms in favor of Mazal, which, after execution, the prescribing No-fault Clinics would transmit to Mazal.

131. In many if not all instances, the Prescribing No-fault Clinics never provided Covered Persons with the prescriptions for Topical Pain Cream to be filled at a pharmacy chosen by the Covered Persons. Rather, the Covered Persons were given the Topical Pain Creams at the Prescribing No-fault Clinics without even being given the prescription, or in some instances, being told that such medication was being prescribed, to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate pharmacy.

132.    On information and belief, the prescriptions for Topical Pain Creams and other select oral medications, including NSAIDs and muscle relaxers, were filled by Mazal as part of illicit and collusive arrangements whereby, in exchange for issuing such prescriptions, the referring No-fault Clinics, Clinic Controllers and/or prescribing providers received illegal payments from Defendants.

133.    At all times relevant herein, Mazal, as well as the No-fault Clinics, Clinic Controllers and prescribing providers, knew that there were effective, commercially available, FDA-approved and cheaper medications which would have been suitable to prescribe to Covered Persons, and that the Topical Pain Creams and/or other select oral medications, including NSAIDs and muscle relaxers, were being prescribed solely to enrich Defendants, the Prescribing No-fault Clinics and Clinic Controllers.

134.    In doing so, and as a result of Defendants' collusive agreements with Prescribing No-fault Clinics, Clinic Controllers and prescribing providers, Defendants promoted the sale of the Topical Pain Creams and other select oral medications over effective, commercially available, FDA-approved, cheaper alternatives, and thereby exercised undue influence over the Covered Persons in order to exploit the Covered Persons for their own financial gain.

135.    Demonstrative that the No-fault Clinics prescribed the Topical Pain Creams in order to exploit the patient for financial gain, irrespective of medical necessity and without regard to genuine patient care, in virtually, if not all instances, the Prescribing No-fault Clinics routinely:

- Failed to document in the Covered Persons' initial or follow-up evaluation reports on why the Topical Pain Cream was medically necessary;

- Failed to document a detailed medical history in Covered Persons' initial or follow-up evaluation reports, thereby failing to fully examine or document potential contraindications or comorbidities;

- Failed to document in Covered Persons' initial or follow-up evaluation reports on why commercially available over-the-counter, FDA approved medications could not be prescribed instead of the Topical Pain Cream; and

- Failed to document in Covered Persons' follow-up reports if the Topical Pain Cream was used by Covered Persons, and if so, was medically beneficial.

136.    Defendants engaged in the scheme to defraud alleged herein when they knew, or should have known, that substantially cheaper and commercially available FDA-approved medications proven to have therapeutic effects were available.

137.    The Topical Pain Creams, including in the form of Diclofenac 3% gel and Lidocaine 5% ointment, could have and should have been replaced with cheaper, over-the-counter and readily available substitutes that have substantially similar, if not identical indications and effects.

138.    The Topical Pain Creams such as those dispensed by Mazal should be a final treatment option after oral medications and other commercially available, over-the-counter, FDA-approved topical creams are ineffective or not tolerated by patients.

### *Topical Lidocaine Pain Ointment*

139.    In order to facilitate the fraud set forth herein, Covered Persons at the Prescribing No-fault Clinics were routinely prescribed another particular Topical Pain Cream, in the form of topical Lidocaine 5% ointment, at voluminous rates and directed to have this prescription filled and dispensed (if at all) by Mazal, pursuant to Defendants' illicit, collusive arrangements with the Prescribing No-fault Clinics, Clinic Controllers and/or prescribing providers, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

140.     Mazal rarely billed Plaintiffs for any formulation of topical Lidocaine other than Lidocaine 5% ointment. The fact that Lidocaine was routinely dispensed and billed by Mazal almost exclusively in this specific formulation demonstrates a lack of individualized patient care.

141.     Lidocaine is a local anesthetic used to relieve neuropathic pain of post-herpetic neuralgia, also referred to as after-shingles pain, and to relieve skin irritations such as minor burns, sunburn, abrasions of the skin, insect bites and hemorrhoids.

142.     According to *New York State Workers' Compensation Board, Non-Acute Pain Medical Treatment Guidelines, (First Edition, September 15, 2014, page 38;* August 25, 2021 Update, effective May 2, 2022, page 39), *New York State Workers' Compensation Board, Mid and Low Back Injury, (First Edition, September 15, 2014;* August 25, 2021 Update, effective May 2, 2022, page 38) and the *New York State Workers' Compensation Board, Neck Injury, (First Edition, September 15, 2014;* August 25, 2021 Update, effective May 2, 2022, page 34): "Topical lidocaine is only indicated when there is documentation of a diagnosis of neuropathic pain. In this instance, a trial for a period of no greater than four weeks can be considered, with the need for documentation of functional gains as criteria for additional use."

143.     The prescribing providers routinely failed to document any functional deficit that could be managed by topical Lidocaine or a contraindication to use oral medications, demonstrating that the Lidocaine 5% ointment was routinely dispensed as part of an illegal kickback arrangement in furtherance of the scheme to defraud alleged herein.

144.     By way of example and not limitation, Lidocaine 5% ointment was prescribed to Covered Persons, dispensed by Mazal and billed to Plaintiffs for reimbursement in the following instances where the examination reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription:

- Covered Person M.M.  (Claim No. 654688944-02) was allegedly involved in a motor vehicle accident on January 5, 2022. Thereafter, on January 13, 2022, M.M. presented to Carlotta Ross-Distin, RPA-C (not named a defendant in the Complaint) at Macintosh Medical PC (not named a defendant in the Complaint)  whose evaluation report only included diagnoses for headaches and cervical, thoracic, lumbar and shoulder sprains, *i.e.*, no neuropathic pain. Regardless, Mazal billed Plaintiffs for allegedly dispensing Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Carlotta Ross-Distin, RPA-C on January 13, 2022 and February 17, 2022.

- Covered Person C.C. (Claim No. 655846152-01) was allegedly involved in a motor vehicle accident on January 12, 2022.  Thereafter, on February 8, 2022, C.C. presented to Carlotta Ross-Distin, RPA-C (not named a defendant in the Complaint) at Macintosh Medical PC (not named a defendant in the Complaint) whose evaluation report only included diagnoses for headaches, and cervical, thoracic, lumbar, shoulder, hip knee, ankle and foot sprains, *i.e.*, no neuropathic pain. Regardless, Mazal billed Plaintiffs for allegedly dispensing Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Carlotta Ross-Distin, RPA-C on February 8, 2022.

- Covered Person S.M.D. (Claim No. 641745294-02) was allegedly involved in a motor vehicle accident on September 11, 2021. Thereafter, S.M.D. presented to Carlotta Ross-Distin, RPA-C (not named a defendant in the Complaint) at Macintosh Medical PC (not named a defendant in the Complaint) whose evaluation report only included diagnoses headaches, and cervical, thoracic, lumbar, shoulder, hip, and knee sprains, *i.e.*, no neuropathic pain. Regardless, Mazal billed Plaintiffs for allegedly dispensing Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Carlotta Ross-Distin, RPA-C on January 18, 2022.

145.    Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for lidocaine ointment, which it often did not, the reports routinely failed to include any potential reason why prescription Lidocaine 5% ointment was medically necessary above and beyond a substantially similar and/or lower strength alternatives that were FDA-approved and commercially available at a fraction of the cost, such as Aspercreme, Icy Hot and Bengay.

146.    Mazal billed between $609.00 and $1,902.50 to fill a single prescription for Lidocaine 5% ointment. However, over-the-counter alternatives, such as Aspercreme and Icy Hot, are commercially available at a retail cost of less than $20 and contain Lidocaine 4%.

147.    Despite this disparity in cost for a substantially similar product, on information and belief, Mazal regularly dispensed and billed for Lidocaine 5% ointment without any indication in the examination reports that the patient first tried any commercially available alternative, even for minor sprains.

148.    By way of example and not limitation, Mazal dispensed Lidocaine 5% ointment for Covered Persons and submitted bills to Plaintiffs for reimbursement even though the evaluation reports and/or other documentation in support of this billing demonstrated no medical necessity for Lidocaine 5% ointment instead of Lidocaine 4% ointment or any indication that the significantly cheaper, commercially available alternative was considered:

- Covered Person A.R. (Claim No. 660109166-02) was allegedly involved in a motor vehicle accident on February 22, 2022. Thereafter, A.R. presented to Kyungsook Bu, NP (not named a defendant in the Complaint) at Bronx Medical Professional, PC d/b/a Sagy Grinberg, MD (not named a defendant in the Complaint) on February 24, 2022.  Even though Kyungsook Bu, NP's report made no mention of A.R. having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% Ointment was prescribed and dispensed by Mazal pursuant to a prescription allegedly issued by Kyungsook Bu, NP on February 24, 2022.

- Covered Person M.V.E. (Claim No. 658438445-01) was allegedly involved in a motor vehicle accident on January 26, 2022. Thereafter, M.V.E. presented to Dr. Jean Marie Gaetan (not named a defendant in the Complaint) at Tri-Borough NY Medical Practice PC (not named a defendant in the Complaint) on February 3, 2022.  Even though Dr. Jean Marie Gaetan's report made no mention of M.V.E. having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% Ointment was prescribed and dispensed by Mazal pursuant to a prescription allegedly issued by Dr. Jean Marie Gaetan on February 3, 2022.

- Covered Person S.M. (Claim No. 658017009-02) was allegedly involved in a motor vehicle accident on February 2, 2022. Thereafter, S.M. presented to Wei Hong Xu, NP (not named a defendant in the Complaint) at Macintosh

Medical PC (not named a defendant in the Complaint) on February 4, 2022. Even though Wei Hong Xu, NP's evaluation report made no mention of S.M. having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% Ointment was prescribed and dispensed by Mazal pursuant to a prescription allegedly issued by Wei Hong Xu, NP on February 4, 2022.

- Covered Person O.B. (Claim No. 655220077-01) was allegedly involved in a motor vehicle accident on January 10, 2022. Thereafter, on the same date, O.B. presented to Wei Hong Xu, NP (not named a defendant in the Complaint) at Macintosh Medical PC (not named a defendant in the Complaint) for an initial evaluation. Even though Wei Hong Xu, NP's evaluation report made no mention of O.B. having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% Ointment was prescribed and dispensed by Mazal pursuant to a prescription allegedly issued by Wei Hong Xu, NP on January 10, 2022.

149. Additionally, Mazal also routinely dispensed and billed Plaintiffs for reimbursement of Lidocaine 5% ointment despite the fact that it was prescribed concurrently with oral medications, such as NSAIDs and muscle relaxers, and/or concurrently with another Topical Pain Cream, such as Diclofenac 3% gel, in order to maximize profits without regard for patient care. By way of example and not limitation, Mazal submitted supporting documentation to Plaintiffs for reimbursement of Lidocaine 5% ointment concurrently with other medications in the following instances:

- Covered Person D.S. (Claim No. 652183567-03) was allegedly involved in a motor vehicle accident on December 7, 2021. Thereafter, D.S. presented at the No-fault Clinic located at 3250 Westchester Avenue, Bronx, New York, where they were purportedly examined by Youn Ju Lee, FNP-C (not named a defendant in the Complaint) of Tri-Borough NY Medical Practice PC (not named a defendant in the Complaint) on December 20, 2021. Mazal then billed Plaintiffs for allegedly dispensing Lidocaine Ointment, 5%, simultaneously with Diclofenac Sodium 3% gel, Celecoxib 200 mg and Cyclobenzaprine 10 mg, on March 2, 2022, pursuant to prescriptions allegedly issued by Youn Ju Lee, FNP-C on February 24, 2022.

- Covered Person A.D.J. (Claim No. 652591918-01) was allegedly involved in a motor vehicle accident on December 16, 2021. Thereafter, A.D.J. presented at the No-fault Clinic located at 60 Belmont Avenue, Brooklyn, New York, where they were purportedly examined by Dr. Jean Marie Gaetan, M.D. (not named a defendant in the Complaint) of Tri-Borough NY Medical Practice PC (not named a defendant in the Complaint) on

December 21, 2021. Mazal then billed Plaintiffs for allegedly dispensing Lidocaine Ointment, 5%, simultaneously with Naproxen Sodium 550 mg and Cyclobenzaprine 10 mg, on January 25, 2022, pursuant to prescriptions allegedly issued by Dr. Jean Marie Gaetan, M.D. on January 18, 2022.

- Covered Person G.R. (Claim No. 653614065-02) was allegedly involved in a motor vehicle accident on December 24, 2021. Thereafter, G.R. presented at the No-fault Clinic located at 4250 White Plains Road, Bronx, New York, where they were purportedly examined by Aleksandr Kopach, PA (not named a defendant in the Complaint) of Macintosh Medical PC (not named a defendant in the Complaint) on January 18, 2022. Mazal then billed Plaintiffs for allegedly dispensing Lidocaine Ointment, 5%, simultaneously with Diclofenac Sodium 3% gel, Tizanidine 4 mg and Celecoxib 200mg, an NSAID, on January 25, 2022, pursuant to a prescription allegedly issued by Aleksandr Kopach, PA on January 19, 2022.

150.    Exhibit "3" in the accompanying Compendium of Exhibits is a spreadsheet listing representative sample of claims submitted by Mazal in which Mazal billed for simultaneously dispensing Lidocaine 5% Ointment with Diclofenac Sodium 3% gel, an oral NSAID and/or an oral muscle relaxant. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0660109166-02, 0658546809-02, 0658017009-03,   0657297353-01, 0655846152-01, 0654688944-02, and 0653614065-02, in which Mazal mailed fraudulent claims for simultaneously dispensing Lidocaine 5% ointment with Diclofenac Sodium 3% gel, and/or an oral NSAID with or without an oral muscle relaxant, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary pharmaceuticals in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

151.    Moreover, Lidocaine 5% ointment is not without risks or side effects, and the increased dosage at which the Prescribing No-fault Clinics and prescribing providers prescribed the Lidocaine increases the risk of the side effects associated with the medication.

152.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest.

153.    Patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams, and no more than 20 grams of ointment should be used in a single day. However, any maximum dosage was virtually never included on the prescriptions purportedly filled by Mazal, which instead, routinely instructed patients to apply 2-3 times per day to the affected area, as needed.

154.    By engaging in a fraudulent scheme whereby Lidocaine 5% ointment was routinely prescribed without medical necessity, instead of (and without first prescribing) lower-strength, FDA-approved commercially available products, and without indication on the prescriptions as to safe dosage, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

155.    Mazal was not and is not entitled to any reimbursement from Plaintiffs for the Lidocaine 5% ointment.

156.    The bills mailed by Mazal were fraudulent in that they misrepresented that (i) the Lidocaine 5% ointment were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Pharmacy Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Lidocaine 5%

ointment that they were not entitled to receive under the No-fault law and implementing regulations.

157.    Defendants' activities described herein with respect to the Lidocaine 5% ointment promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

### *Topical Diclofenac Gel*

158.    In order to facilitate the fraud set forth herein, Covered Persons at the Prescribing No-fault Clinics were routinely prescribed a particular Topical Pain Cream, in the form of topical Diclofenac Sodium 3% gel, at voluminous rates and directed to have this prescription filled and dispensed by Mazal, pursuant to Defendants' illicit, collusive arrangements with the Prescribing No-fault Clinics, Clinic Controllers and/or prescribing providers, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

159.    Mazal rarely billed Plaintiffs for any formulation of topical Diclofenac other than Diclofenac Sodium 3% gel. The fact that Diclofenac was routinely dispensed and billed by Mazal almost exclusively in this specific formulation demonstrates a lack of individualized patient care.

160.    Diclofenac gel or cream is a topical NSAID that is commonly used to treat osteoarthritis and skin irritations such as actinic keratosis ("AK"), a type of warty skin growth.

161.    Notwithstanding any potential application of lower dosage pain patches and topical applications of Diclofenac Sodium available over-the-counter, and ignored by the Prescribing No-fault Clinics, Diclofenac Sodium 3% gel does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, and such application of Diclofenac Sodium 3% Gel is not an accepted off-label use.

162.    Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for Diclofenac, which it often did not, the reports routinely failed to include any potential reason why Diclofenac Sodium 3% gel was medically necessary above and beyond a substantially similar and/or lower strength alternatives that were FDA-approved and commercially available at a fraction of the cost. Exhibit "4" in the Compendium of Exhibits is a spreadsheet listing representative sample of claims submitted by Mazal in which Mazal billed for Diclofenac Sodium 3% gel where the initial or follow-up examination report corresponding to the prescription purportedly filled by Mazal did not include any indication that a lower strength alternative was attempted but failed during a conservative course of treatment and failed to include any other potential reason why Diclofenac Sodium 3% gel was medically necessary above and beyond a substantially similar lower strength commercially available over-the-counter alternative. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0641745294-02, 0647724129-01, 0653614065-02, 0654688944-02, 0658017009-02, and 0660109166-02, in which Mazal mailed fraudulent claims for Diclofenac Sodium 3% gel, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for medically unnecessary pharmaceuticals in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

163.    By engaging in a fraudulent scheme whereby Diclofenac Sodium 3% gel was routinely prescribed without medical necessity, instead of (and without first prescribing) lower-strength, FDA-approved commercially available products, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

164.     Mazal billed $944.00 to $2,360.00 to fill a single prescription of Diclofenac Sodium 3% gel.

165.     Diclofenac Sodium is not without risks or side effects, and the increased dosage at which the Prescribing No-fault Clinics and prescribing providers prescribed the Diclofenac increases the risk of the side effects associated with the medication.

166.     The major risks associated with Diclofenac Sodium 3% gel include heart and blood vessel issues, including heart disease, heart attack and stroke, as well as severe stomach and bowel issues, including ulcers, intestinal bleeding or perforation. The associated risks are high in those with pre-existing cardiovascular and gastrointestinal issues.  The risks are also greater with higher doses and long-term use.

167.     In fact, the United States Food and Drug Administration ("FDA") requires a "Black Box" warning for topical Diclofenac, which the FDA imposes when a drug carries a serious safety risk.  For topical Diclofenac, the "Black Box" warning lists the risks of serious cardiovascular and gastrointestinal events, which can be fatal.

168.     Furthermore, topical Diclofenac is classified as a NSAID and prescribing it concurrently with other oral NSAIDs, such as ibuprofen, naproxen, and/or meloxicam, could result in an increased risk of adverse events, such as hemorrhage, or a higher rate of gastrointestinal toxicity.  FDA product labels for over-the-counter brands of a lower dosage of topical Diclofenac contain warnings to this effect and generally recommend against concomitant use.

169.     By way of example and not limitation, Defendants' fraudulent scheme set forth herein resulted in therapeutic duplication with Diclofenac being prescribed concurrently with oral NSAIDs in the following occasions:

- Covered Person D.S. (Claim No. 652183567-03) was allegedly involved in a motor vehicle accident on December 7, 2021. Thereafter, D.S. presented

at the No-fault Clinic located at 3250 Westchester Avenue, Bronx, New York, where they were purportedly examined by Youn Ju Lee, FNP-C (not named a defendant in the Complaint) of Tri-Borough NY Medical Practice PC (not named a defendant in the Complaint) on December 20, 2021. Mazal then billed Plaintiffs for allegedly dispensing Diclofenac Sodium 3% gel simultaneously with Celecoxib 200 mg, an NSAID, on March 2, 2022 pursuant to a prescription allegedly issued by Youn Ju Lee, FNP-C on February 24, 2022.

- Covered Person A.R. (Claim No. 660109166-02) was allegedly involved in a motor vehicle accident on February 22, 2022. Thereafter, A.R. presented at the No-fault Clinic located at 1735 Pitkin Avenue, Brooklyn, New York, where they were purportedly examined by Kyungsook Bu, NP (not named a defendant in the Complaint) of Bronx Medical Professional, PC d/b/a Sagy Grinberg, MD (not named a defendant in the Complaint) on February 24, 2022. Mazal then billed Plaintiffs for allegedly dispensing Diclofenac Sodium 3% gel simultaneously with Celecoxib 200 mg, an NSAID, on March 2, 2022, pursuant to a prescription allegedly issued by Kyungsook Bu, NP on February 24, 2022.

170. On information and belief, Defendants' illegal, collusive arrangements with the No-fault Clinics, Clinic Controller and/or prescribing providers, which caused Diclofenac Sodium 3% gel to be prescribed to Covered Persons at excessive amounts without individualized care, was profit-driven and demonstrated a genuine disregard for the patients' health and safety.

171. Mazal was not and is not entitled to any reimbursement from Plaintiffs for Diclofenac Sodium 3% gel.

172. The bills mailed by Mazal were fraudulent in that they misrepresented that (i) the Diclofenac Sodium 3% gel were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Pharmacy Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Diclofenac Sodium 3% gel that they were not entitled to receive under the No-fault law and implementing regulations.

173.    Defendants' activities described herein with respect to Diclofenac Sodium 3% gel promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

### B.    Defendants' Scheme was Designed to Maximize Their Financial Gain

174.    Defendants targeted ingredients such as Diclofenac Sodium 3% and Lidocaine 5% to be part of the Topical Pain Creams routinely prescribed pursuant to the fraudulent scheme set forth herein because Mazal could readily purchase topical Diclofenac and Lidocaine at a low cost but bill out the Topical Pain Creams at egregiously high wholesale prices based on the Pharmacy Fee Schedule.

175.    Pursuant to the Pharmacy Fee Schedule governing topical pain cream products, Mazal was entitled to the average wholesale price (AWP) minus 12% (for brand name drugs) or 20% (for generic drugs) for each ingredient within the cream, together with a nominal dispensing fee.

176.    In connection with Mazal's request for reimbursement from Plaintiffs, Mazal typically submitted an NF-3 form, which included the purported NDC numbers and corresponding charges for each drug product dispensed.

177.    The NDC numbers listed on the NF-3 form submitted by Mazal are what identified the purported AWPs for each of the Topical Pain Creams and other select oral medications that Mazal purported to dispense.

178.    Defendants never submitted wholesale purchase invoices to Plaintiffs demonstrating how much Mazal actually paid the suppliers for Topical Pain Creams and other select oral medications, including NSAIDs and muscle relaxers, or whether Mazal actually purchased the pharmaceuticals with the NDC numbers listed in the billing submissions.

179.   On information and belief, the illegal kickback and referral arrangements Defendants entered into with Prescribing No-fault Clinics, Clinic Controllers and prescribing providers targeting these specific Topical Pain Creams and other select oral medicals, including NSAIDs and muscle relaxers, was motivated by profit maximization rather than genuine patient care.

180.   Defendants' activities described herein with respect to the Topical Pain Creams and other select oral medications, including NSAIDs and muscle relaxers, which were prescribed pursuant to a fraudulent scheme and pursuant to illegal, collusive kickback arrangements, promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

## DISCOVERY OF THE FRAUD

181.   To induce Plaintiffs to promptly reimburse their claims for the Topical Pain Creams, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Moses, through Mazal, routinely and deliberately submitted facially valid claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Moses, through Mazal, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Moses, through Mazal, knowingly misrepresented and concealed that Mazal's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement.

182.     Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $134,000.00 based upon the fraudulent bill submissions.

183.     Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered the fraud until in or about June 2023.

## STATEMENT OF CLAIMS

## FIRST CLAIM FOR RELIEF

## AGAINST MOSES, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5

## (RICO, pursuant to 18 U.S.C § 1962(c))

184.     The allegations of paragraphs 1 through 183 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

185.     From in or about 2021 through the filing of this Complaint, Moses and one or more of the John Does 1 through 5 and ABC Corporations 1 through 5 conducted and participated in the affairs of the Mazal enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein and in the representative list of predicate acts, annexed hereto, all of which are incorporated by reference. Defendant's conduct constitutes a violation of 18 U.S.C. § 1962(c).

186.   At all relevant times mentioned herein, Moses participated in the affairs of the Mazal enterprise through continuing a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the dispensing of pharmaceutical products, including but not limited to Topical Pain Creams and/or select other oral medications, such as NSAIDs and muscle relaxers, (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

187.   One or more of the John Does 1 through 5 and one or more of the ABC Corporations 1 through 5 participated in the scheme by ensuring that the No-Fault Clinics provided the Mazal enterprise with a steady and ample supply of fraudulent prescriptions for medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Creams, and oral NSAIDS, muscle relaxants and other pain medications, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics or Clinic Controllers, as well as bogus documentation, that misrepresented necessity of the pharmaceutical products to facilitate the fraudulent billing alleged in the Complaint.  One or more of the ABC Corporations furnished documents that Defendant Moses required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent pharmaceutical claims.

188.   It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics or Clinic Controllers, that the bogus documentation provided by one or more

of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would

be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

<strong>The Pattern of Racketeering Activity<br>(Racketeering Acts)</strong>

189.    The racketeering acts set forth herein were carried out on a continued basis for more

than a four-year period, were related and similar, and were committed as part of the ongoing

scheme of Moses, one or more of the John Does 1 through 5, and one or more of the ABC

Corporations 1 through 5, to fraudulently bill pharmaceutical products, including but not limited

to Topical Pain Creams and/or select oral medications, including NSAIDs and muscle relaxers, to

defraud insurers and, if not stopped, will continue into the future.

190.    This pattern of racketeering activity poses a specific threat of repetition extending

indefinitely into the future, inasmuch as the Mazal enterprise continues to pursue collection on the

fraudulent billing to the present day.

191.    As a part of the pattern of racketeering activity, and for the purpose of executing

the scheme and artifice to defraud as described above, Moses, with the knowledge and intent of

one or more of the John Does 1 through 5 and one or more of the ABC Corporations 1 through 5,

caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. §

1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to

induce them to issue checks to Mazal based upon materially false and misleading information.

192.    Through the Mazal enterprise, Moses submitted fraudulent claim forms seeking

payment for pharmaceutical products, including but not limited to Topical Pain Creams and other

select oral medications, such as NSAIDs and muscle relaxers, that were dispensed (i) pursuant to

an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-

determined protocol without regard for medical necessity; (iii) in violation of New York State laws

47

regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions. The bills and supporting documents that were sent by and/or on behalf of Moses and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Moses, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5 engaged in a continuous series of predicate acts of mail fraud.

193.     A sample list of predicate acts is annexed hereto which identifies the nature and date of mailings that were made by or on behalf of Moses in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

194.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

195.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### Damages

196.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property, in an amount in excess of $134,000.00, the exact amount to be determined at trial.

197.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are entitled to recover, from Moses, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

## AGAINST MAZAL AND MOSES

### (Common Law Fraud)

198.    The allegations of paragraphs 1 through 183 are hereby repeated and re-alleged as though fully set forth herein.

199.    Defendants Mazal and Moses intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and misleading statements of material fact as to the necessity and price of the pharmaceutical products which they purportedly dispensed, thereby inducing Plaintiffs to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature. As part of the fraudulent scheme implemented by Moses, Mazal made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

200.    Defendants Mazal and Moses intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the dispensing of pharmaceutical products, including but not limited to the Topical Pain Creams and select other oral medications, including NSAIDs and muscle relaxers, were misrepresented.

201.    Defendants Mazal and Moses intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the pharmaceutical products which they purportedly dispensed, including but not limited to the Topical Pain Creams and select other oral medications, including NSAIDs and muscle relaxers, were dispensed (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in

violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) as the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

202.   Defendants Mazal and Moses intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the services were provided pursuant to a protocol that was intended to maximize Defendants' profits and reimbursements of payments from Plaintiffs, as opposed to medical necessity.

203.   On information and belief, Defendants Moses, through Mazal intentionally, knowingly, fraudulently, and with the intent to deceive, submitted, or caused to be submitted to Plaintiffs, patient medical records, assignments of benefits, prescriptions, reports, treatment verifications and/or bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements that Mazal was dispensing Topical Pain Creams and select oral medications, including NSAIDs and muscle relaxers, pursuant to legitimate New York State Prescriptions, when it was not;

- False and misleading statements that Mazal was billing Plaintiffs the maximum permissible charges under the No-fault Law for the Topical Pain Creams and select other oral medications, including NSAIDs and muscle relaxers, allegedly provided to Covered Persons, when it was not;

- False and misleading statements that Mazal was in conformance with core licensing requirements and entitled to receive No-fault benefits when in fact Defendants participated in collusive relationships with medical providers through which Defendant filled prescriptions pursuant to an illegal kickback and referral scheme for medically unnecessary pharmaceuticals;

- False and misleading statements as to why the Topical Pain Creams and select oral medications, including NSAIDs and muscle relaxers, were medically necessary; and

- False and misleading statements regarding the availability of over-the-counter, FDA approved medications in lieu of Topical Pain Creams and

select oral medications that were purportedly provided by Defendants as part of a predetermined protocol of treatment.

204.    In numerous instances, the medical records, reports, prescriptions and bills submitted, or caused to be submitted, by Defendants Moses, through Mazal to Plaintiffs in connection with Defendants' requests for reimbursement contained false representations which were intended not only to defraud Plaintiffs but constituted a grave and serious danger to the Covered Persons and the consumer public.

205.    The foregoing was intended to deceive and mislead Plaintiffs into believing that Moses, through Mazal, was providing medically necessary Topical Pain Creams and other select oral medications, including NSAIDs and muscle relaxers, when, in fact, they were not.

206.    Defendants Mazal and Moses knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

207.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which they were led to believe as a result of Defendants' acts of fraud and deception.

208.    Had Plaintiffs known of the fraudulent content of, and misrepresentations within the documentation and bills, submitted to them, Plaintiffs would not have paid Mazal for claims for No-fault insurance benefits submitted in connection therewith.

209.    Furthermore, Defendants Mazal and Moses's far-reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

210.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount in excess of $134,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## <u>AGAINST DEFENDANTS MAZAL AND MOSES</u>

### (Unjust Enrichment)

211.    The allegations of paragraphs 1 through 183 are hereby repeated and re-alleged as though fully set forth herein.

212.    By reason of their wrongdoing, Defendants Mazal and Moses have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

213.    Plaintiffs are therefore entitled to restitution from Defendants Mazal and Moses in the amount by which they have been unjustly enriched.

214.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount in excess of $134,000.00, the exact amount to be determined at trial, plus interest, costs and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

## <u>AGAINST MAZAL</u>

### (Declaratory Judgment under 28 U.S.C. § 2201)

215.    The allegations of paragraphs 1 through 183 are hereby repeated and re-alleged as though fully set forth herein.

216.    At all relevant times mentioned herein, each and every bill mailed by Moses, through Mazal, to Plaintiffs, sought reimbursement for medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Creams and a limited variety of other oral medications.

217.    At all times relevant herein, Defendants Mazal and Moses exploited the No-fault Law through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing pursuant to an unlawful kickback/referral arrangement.

218.    At all relevant times mentioned herein, each and every bill mailed by Mazal to Plaintiffs sought reimbursement for Topical Pain Creams and/or select other oral medications, including NSAIDs and muscle relaxers, that were dispensed: (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions.

219.    Because Mazal engaged in the conduct alleged herein, Plaintiffs seek a declaration that they are not required to pay any of Mazal's claims for Topical Pain Creams and/or select oral medications, including NSAIDs and muscle relaxants, which were dispensed pursuant to the scheme to defraud alleged herein.

220.    As the Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the pharmaceuticals purportedly provided to Covered Persons and the amounts they were entitled to be reimbursed, it is respectfully requested that this Court issue an order declaring that Mazal is not entitled to receive payment on any pending, previously-denied

and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of Mazal's No-fault claims.

221.    The Defendants will continue to seek reimbursement from Plaintiffs for their false and fraudulent claims absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

222.    Plaintiffs have no adequate remedy at law.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i)      Compensatory damages, in an amount in excess of $134,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)     Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)     Declaratory relief on the Fourth Claim for Relief declaring that Plaintiffs have no obligation to pay any of Defendant Mazal's unpaid claims for Topical Pain Creams and/or select oral medications, whether pending, previously denied and/or submitted, regardless of whether such unpaid claims were ever denied, and regardless of the purported dates of service; and

vii)      Costs, reasonable attorneys' fees and such other relief that the Court deems just and

proper.

Dated: New York, New York,
         September 18, 2024

                                         MANNING & KASS, ELLROD, RAMIREZ,
                                            TRESTER LLP


                                         By: _/s/ Lee Pinzow_____
                                             Robert A. Stern
                                             James A. McKenney
                                             Kristy R. Eagan
                                             Lee Pinzow

                                             100 Wall Street, Ste 700
                                             New York, New York 10005
                                             (212) 858-7769

                                             *Attorneys for Plaintiffs Allstate Insurance
                                             Company, Allstate Fire and Casualty
                                             Insurance Company, Allstate Indemnity
                                             Company, and Allstate Property and
                                             Casualty Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, <br><br>                             **Plaintiffs,** <br><br> -against- <br><br> MAZAL PHARMACY INC d/b/a MIRAGE PHARMACY, SOLOMON MOSES a/k/a SULEMAN MUSAEV, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5, <br><br>                             **Defendants.** | CIVIL ACTION <br><br> 24-CV-6570 <br><br> COMPLAINT <br><br> (JURY TRIAL DEMANDED) |

# COMPLAINT

MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS FOR PLAINTIFFS
100 WALL STREET, SUITE 700
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 858-7769